UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

BRITTANY M. HUNT,          )
          )
      Plaintiff,       )
          )
      v.          )      No. 1:18-cv-01505-RLY-MJD
          )
HUBLER CHEVROLET, INC.,     )
BRADLEY MANAGEMENT GROUP, INC.,   )
          )
      Defendants.     )

**REPORT AND RECOMMENDATION
ON PLAINTIFF'S MOTION FOR SANCTIONS**

This matter is before the Court on Plaintiff's *Motion for Sanctions Against Defendants for Perjury and Spoliation of Evidence* [Dkt. 86]. Pursuant to 28 U.S.C. § 636, United States Magistrate Judge, the Honorable Mark J. Dinsmore, "is hereby designated . . . to conduct a report and recommendation regarding the Motion [86] for Sanctions . . . ." [Dkt. 87.] For the reasons set forth below, the Magistrate Judge recommends Plaintiff's motion be **GRANTED**.

## I. Background

In this action, Plaintiff alleges that on April 9, 2018 she "purchased a new [Trax] from Defendants[,]" pursuant to a Retail Installment Contract and Security Agreement, traded in a Chevrolet HHR as a $550.00 trade allowance value toward the purchase, and paid a down payment totaling $1,500.00. [Dkt. 1 at 2.] On April 12, 2018, Plaintiff contends she inquired about a return period for the car but was told by Defendants there was no such option. [Dkt. 1 at 3.] On April 17, 2018, Plaintiff stated she received communication from Defendants that she must return the car to the dealership or that it would be reported as stolen. [Dkt. 1 at 3.] After

1

finishing dinner with her two-year-old son on the evening of April 17, 2018, Plaintiff was unable

to start the vehicle, while parked in the lot outside the restaurant.  [Dkt. 1 at 3-4.]  Plaintiff

contacted Hubler Automotive Group, Finance Department, to investigate the disabled car and

stated she was told that "Defendants' threat to report the car as stolen was merely a bluff because

Defendants had no right to repossession of the car."  [Dkt. 1 at 4.]  Plaintiff contended during or

after her call to Hubler Finance, the Trax car alarm went off and "six police cars surrounded

Plaintiff and her two-year-old son in the Trax . . . . Two of the police officers pointed guns at

Plaintiff's head and ordered her out of the Trax."  [Dkt. 1 at 4.]  Police officers handcuffed the

Plaintiff while assessing the situation; Plaintiff stated police told her they were investigating a

stolen car report.  [Dkt. 1 at 4.]  After reviewing Plaintiff's paperwork regarding the vehicle

transaction, Plaintiff stated "police expressed dismay that the Trax had been falsely reported as

stolen, removed her handcuffs, and apologized . . . ."  [Dkt. 1 at 4.]  The Trax was unable to be

started via its OnStar system, and Plaintiff asserted that a towing company called to the scene

"confirmed that Defendants disabled the Trax through a remote system."  [Dkt. 1 at 5.]

On April 18, 2018, Plaintiff attempted to recover her trade-in vehicle and her down

payment from Defendants.  Plaintiff claims that, in order to receive her down payment,

Defendants tried to persuade Plaintiff to first sign a settlement agreement and release to

ultimately waive Plaintiff's rights, which she did not sign.  [Dkt. 1 at 5.]  On May 16, 2018,

Plaintiff filed her *Complaint* alleging the following counts: 1) Violation of 42 U.S.C. § 1981

citing race as a "motivating factor in Defendants' acts to prevent Plaintiff from enjoying the

benefits and privileges afforded to her by law under the Retail Installment Contract and Security

Agreement," 2) Violation of 42 U.S.C. § 1982 alleging Defendants "deprived Plaintiff of the

same right to personal property that is enjoyed by white citizens," 3) Violation of the Indiana

Deceptive Trade Practice Act, Ind. Code §§ 24-5-0.5-1 *et seq.*, 4) Wrongful Repossession, 5)

Conversion, 6) Breach of Contract, 7) Assault, 8) Defamation, and 9) Intentional Infliction of Emotional Distress.  [*See* Dkt. 1.]

On May 6, 2019, Plaintiff filed her *Motion for Sanctions Against Defendants for Perjury and Spoliation of Evidence* [Dkt. 86].  Defendants filed their *Response to Plaintiff's Motion for Sanctions* [Dkt. 92] on May 17, 2019.  Plaintiff filed her *Reply* in support on May 21, 2019. [Dkt. 93.]  The Court held an in-person hearing on Plaintiff's motion on May 24, 2019; "[a]rgument was heard and the motion was taken under advisement."  [Dkt. 95.]  Additionally, the Court ordered Plaintiff to file the following: 1) copies of the Defendants' "recent supplemental discovery responses"; 2) Officer Andrew Sheler's "complete" deposition transcript; 3) and a "document produced by Defendant Bradley Management Group and identified by Plaintiff during oral argument."[1]  [Dkt. 95.]  Plaintiff timely filed the supplemental submissions in satisfaction of the Court's request.  [Dkt. 94.]  The Court notes that Defendants filed a *Motion for Leave to File a Surreply to Plaintiff's Motion for Sanctions* [Dkt. 101] on June 12, 2019;[2] the Court **DENIES** Defendants' motion.  Thus, the Plaintiff's *Motion for Sanctions* is now ripe for the Court's ruling.

---

[1] The Court notes the document referred to during oral argument has been filed at Dkt. 94-2 and consists of the Business Development Center's ("BDC") Employee Relations: Lead Loyalty, Employee Relations Monitoring Procedure, and a Training and Development: Inbound and Outbound Presentation Script that "[a]pplies to Hubler Automotive Group BDC operations and employees."  [Dkt. 94-2 at 2.]  These materials are dated from 2017 and appear to have been revised in February 2019.  [Dkt. 94-2.]

[2] Defendants' *Motion for Leave to File a Surreply* argues that "[i]n the interests of fairness and in order to be able to respond to Plaintiff's new evidence and supplemental submissions, Defendants request leave to file a surreply to the motion for sanctions once they had a chance to depose Officer Sheler and respond to the one-sided testimony submitted to the Court ***after*** the hearing." [Dkt. 101 at 2] (emphasis in original).

The items the Magistrate Judge requested at the conclusion of the May 24, 2019 hearing do not constitute new evidence; rather these items consisted of: 1) Defendant Bradley Management Group's most recent supplemental discovery responses dated May 20, 2019 (**just four days before the hearing** and **after** Plaintiff filed her motion), 2) the complete transcript of the deposition of

## **II. Legal Standard**

A court's authority to sanction parties under Federal Rule of Civil Procedure 37 applies in those instances where a party has failed to comply with a court order, though this order need not be "a formal order"; rather, "[a]n agreement or promise between the parties to conduct discovery in particular fashion may constitute an order." *Blasius v. Angel Auto.*, No. 3:13-CV-46-JVB-CAN, 2014 WL 12783287, at *3 (N.D. Ind. Apr. 3, 2014). The Court has "broad discretion" when considering imposition of sanctions "but any sanction imposed must be 'proportionate to the circumstances surrounding a party's failure to comply with discovery rules.'" *Deere v. Am. Water Works Co., Inc.*, 306 F.R.D. 208, 224 (S.D. Ind. Mar. 26, 2015) (quoting *Melendez v. Ill. Bell Tel. Co.*, 79 F.3d 661, 672 (7th Cir. 1996)).

Plaintiff points to a court's inherent authority "to fashion an appropriate sanction for conduct which abuses the judicial process[,]" which may include spoliation of evidence or

---

Officer Andrew Sheler, of which the Court already possessed partial copies in the form of attached excerpts, and 3) a document referenced during the hearing that had been in the possession of Defendant Bradley Management Group and was produced to Plaintiff during discovery. As these items within Plaintiff's *Supplemental Submission in Support of Motion for Sanctions* [Dkt. 94] are not new, Defendants had a full and fair opportunity during the hearing during which the documents were requested to respond to these "additional approximately seventy pages of exhibits requested by the Court" that Defendants reference in their motion.

Defendants point to Plaintiff's filing of a *Second Supplemental Submission in Support of the Motion for Sanctions* [Dkt. 100] dated June 10, 2019, that attached Officer Andrew Sheler's affidavit. The Court acknowledges Officer Sheler "elected to complete his testimony by affidavit," and this testimony was presented **after** the hearing. The Court will further discuss the subject of Officer Sheler's role in this matter and the multiple attempts that have been made to secure his deposition, within this Order. The Court explicitly states that this Order and its sanction recommendations **are not based upon Officer Sheler's affidavit**; rather, the Court's Order recognizes a comprehensive and independent basis for sanctions against Defendants. Any information referred to from Officer Sheler's affidavit serves only to provide additional support, *above and beyond*, the Court's outlined analysis. As the Court has not based its determination upon newly entered evidence, it is not persuaded by Defendants' arguments for leave to file a surreply. Further, in the Court's June 11, 2019 Minute Entry, the Court granted leave for Defendants to depose Officer Sheler "after the close of liability discovery . . . [to] be completed within thirty days[.]" [Dkt. 103.]

perjury of an opposing party.  *See Chambers v. Nasco, Inc.*, 501 U.S. 32, 50-51 (1991) (sanctions utilized when bad faith conduct exists in litigation).  Assessing whether spoliation occurred requires a two-part inquiry.  First, the Seventh Circuit has noted that "courts have found a spoliation sanction to be proper only where a party has a duty to preserve evidence because it knew, or should have known, that litigation was imminent." *Trask-Morton v. Motel 6 Operating L.P.*, 534 F.3d 672, 681 (7th Cir. 2008); *see also Norman-Nunnery v. Madison Area Tech. Coll.*, 625 F.3d 422, 429 (7th Cir. 2010) (observing that Plaintiff "fail[ed] every element of the test for spoliation inference" where evidence was destroyed "before [defendant] knew or should have known that litigation was imminent").  Thus, any sanction for spoliation must follow a finding that Defendants were under a duty to preserve evidence.

Second, a showing of "bad faith" is "a prerequisite to imposing sanctions for the destruction of evidence." *Trask-Morton*, 534 F.3d at 681.  "'[B]ad faith' means destruction for the purpose of hiding adverse information*." Mathis v. John Morden Buick, Inc.*, 136 F.3d 1153, 1155 (7th Cir. 1998) (To determine whether "bad faith" exists is a "question of fact like any other, so the trier of fact is entitled to draw any reasonable inference.").  The mere showing that "a party intentionally destroyed evidence" does not constitute bad faith. *Blasius*, 2014 WL 12783287, at *5.  Sanctions for spoliation thus may not be imposed simply because evidence was destroyed; more precisely, "the crucial element is not that evidence was destroyed but rather the reason for the destruction." *Park v. City of Chi.*, 297 F.3d 606, 615 (7th Cir. 2002).  The movant bears the burden to make the showing of bad faith. *Bracey v. Grondin*, 712 F.3d 1012, 1019 (7th Cir. 2012).

In this matter, Plaintiff alleges Defendants perjured themselves in their interrogatory responses during the discovery process.  Perjury is defined in the criminal context as "false testimony concerning a material matter with the willful intent to provide false testimony, rather

than as a result of confusion, mistake, or faulty memory." *Montano v. City of Chi.*, 535 F.3d 558, 564 (7th Cir. 2008) (citation and quotation marks omitted).  The elements of such offense are: 1) "false testimony;" 2) "materiality;" and 3) "willful intent."  *United States v. Savage*, 505 F.3d 754, 763 (7th Cir. 2007).  The Seventh Circuit has applied this definition when considering litigation sanctions in civil cases, such as the matter at hand, and the Magistrate Judge will accordingly apply that definition to the analysis of the perjury allegations in Plaintiff's motion. *See, e.g., Montano*, 535 F.3d at 564.

### III. Discussion

In the May 24, 2019 hearing before the Magistrate Judge, Plaintiff's counsel summarized Plaintiff's allegations of Defendants' sanctionable conduct by dividing it into the following three categories: 1) destruction of material evidence,[3] 2) providing false statements concerning material facts and evidence,[4] and 3) withholding material evidence.[5]  Plaintiff's counsel further divides these broad categories into subcategories of the specific incidences of Defendants'

---

[3] Plaintiff's destruction of evidence claims include the following conduct of Defendants: 1) deletion of the text messages between Tyler Parr and Brittany Hunt; 2) deletion of text messages between Officer Sheler and Joe Folck; 3) the wiping of Tyler Parr's company computer and the deletion of both Tyler Parr and Greg Newlin's company emails; 4) the destruction of Defendants' computer data stored in RouteOne, GM Global Connect, and AutoBase (Customer Retention Software).  For purposes of this Order, the Court will refer to these allegations as Plaintiff's "spoliation claims."

[4] Plaintiff's false statements of material facts and evidence claims include the following conduct of Defendants: 1) false statements regarding Defendant Bradley Management Group's functionality and role in business practice and this litigation; 2) false statements regarding the role of Officer Sheler in relation to Defendants' business and this litigation; and 3) false statements regarding the preservation of evidence contained within RouteOne, GM Global Connect, and AutoBase.  For purposes of this Order, the Court will refer to these allegations as Plaintiff's "perjury claims."

[5] Plaintiff's withholding of material evidence claims include the following conduct of Defendants: 1) previous settlement agreements not produced; 2) "dead deal" or "backed-out" files held by Defendant Bradley Management group not yet being produced; 3) failure of Defendant Bradley Management Group to produce its corporate documents as ordered by this Court; 4) failure to

alleged conduct.  The Court's analysis will address each of Plaintiff's outlined categories of Defendants' conduct in turn to assess the appropriateness of sanctions.

### A. **Plaintiff's Spoliation Claims**

The Court must first determine Defendants' duty to preserve evidence in litigation and when such duty first arises.  "A party has a duty to preserve evidence when it knows, or should have known, that litigation was imminent." *Trask-Morton*, 534 F.3d at 681.  "At the latest, this duty attaches when the plaintiff informs the defendant of his potential claim." *Chandler v. Buncich*, No. 2:12-CV-175, 2012 WL 4343314, at *1 (N.D. Ind. Sept. 24, 2012).  The duty may arise "even prior to the filing of a complaint as long as it is known that litigation is likely to commence." *MacNeil Auto Prods., Ltd. v. Cannon Auto. Ltd.*, 715 F. Supp. 2d 786, 801 (N.D. Ill. 2010).  Once the duty of preservation attaches, it imposes a "broad" obligation "encompassing ***any relevant evidence*** that the non-preserving party knew or reasonably could foresee would be relevant to the action." *Chandler*, 2012 WL 4343314, at *1 (emphasis added); *see also MacNeil*, 715 F. Supp. 2d at 800 ("A party has a duty to preserve evidence over which it had control and reasonably knew or could reasonably foresee was material to a potential legal action.").

The April 17, 2018 incident of the Trax being reported stolen and Brittany Hunt being surrounded at gunpoint and detained by officers responding to the stolen car report marks the very subject matter of this lawsuit.  Plaintiff contended that on April 19, 2019, when Plaintiff returned to the dealership to collect her trade-in vehicle and the refund of her down payment, "Defendants presented Plaintiff with their proposed settlement agreement and demanded that she

---

produce documents regarding Officer Sheler; and 5) selective production of Tyler Parr's text messages with Brittany Hunt.  For purposes of this Order, the Court will refer to these allegations as Plaintiff's "violations of the Court's prior discovery Order claims."

sign the agreement . . . [i]n the presence of Defendants, Plaintiff called an attorney . . . [and] Defendants relented . . . ." [Dkt. 86-1 at 5.]  That same day, Indiana Dealer Counsel, Michael Shanahan, emailed an attached settlement agreement to Plaintiff's counsel for her review and client approval.[6] [Dkt. 86-6.]  Further, through the disclosure of Defendants' privilege log, privileged communications regarding "issues" with Plaintiff, knowledge of the existence of Plaintiff's counsel, and a potential settlement agreement were logged throughout April 19 and 20, 2018.[7] [Dkt. 86-5.]  The Court finds no doubt that Defendants were on notice and operating as though litigation may be imminent during these first few days after the car was reported stolen.  In fact, Defendants were affirmatively put on notice of the outset of litigation on May 16, 2018, when Plaintiff filed her initial *Complaint* [Dkt. 1] and when Defendants accepted service by May 18, 2018.  [Dkt. 5; Dkt. 6.]  Defendants' duty to preserve "***any relevant evidence*** that the non-preserving party knew or reasonably could foresee would be relevant to the action" arose long before any initial disclosure deadline or request for discovery was served.  **The Court finds the duty of Defendants to preserve evidence existed and was triggered on April 19, 2018.**

Moreover, the Court finds the information Plaintiff sought regarding text messages between Tyler Parr (the salesperson who worked directly with Brittany Hunt) and Plaintiff; text messages between Officer Sheler (a non-party listed by Defendants in this litigation) and Defendant Hubler's General Manager, Joseph Folck, regarding Plaintiff; company computer and

---

[6] The settlement agreement was emailed to Plaintiff's counsel at 1:29 PM on Thursday, April 19, 2018.  [Dkt. 86-6.]  The Court notes Defendants' own privilege log consisted of entries regarding "advice as to Plaintiff's counsel's voicemail," "discussion of issues with Plaintiff," and "regarding advice as to settlement agreement," beginning on April 19, 2018, at 10:00 AM, *well before* Plaintiff's counsel was provided a proposed settlement agreement to review.  [Dkt. 86-5.]

[7] Defendants' privilege log explicitly references entries "regarding police involvement," "regarding litigation," "regarding Plaintiff signing settlement agreement," and "regarding hearing from Plaintiff or Plaintiff's counsel" between April 19 and 20, 2018.  [Dkt. 86-5.]

email evidence regarding Plaintiff's transaction with Defendants; and customer information entered and generated from Defendants' cloud-based software programs utilized in Plaintiff's transaction with Defendants, was directly relevant to this litigation. **Therefore, the Court finds Defendants were obligated to preserve the aforementioned evidence. As such, step one of the spoliation analysis has been met.** The Court will address each of Plaintiff's specific claims under step two of the spoliation inquiry, for determinations of Defendants' "bad faith" to warrant Plaintiff's requested sanctions.

**1. Text Messages, Company Computer & Email Accounts**

The Court acknowledges the distinct importance of electronic discovery in the forms of text messages, computer-based tools, and email correspondence as each relates to the transaction between Plaintiff and Defendants in this case. We live in a world of technology and as such:

> [t]he value of emails and text messages can be particularly significant in litigation due to the fact that the ease of sending or replying to such messages can cause people to say things they might not otherwise say in traditional correspondence. Indeed they are often replete with unrehearsed, spontaneous statements that surpass in simplicity and frankness and ease of understanding other far more complicated bits of evidence.

*BankDirect Capital Fin., LLC v. Capital Premium Fin., Inc.*, No. 15 C 10340, 2018 WL 1616725, at *10 (N.D. Ill. Apr. 4, 2018); *see, e.g.*, William A. Herbert, *The Electronic Workplace: To Live Outside the Law You Must Be Honest*, 12 EMP. RTS. & EMP. POL'Y J. 49, 5152 (2008) ("Electronic communications have the potential to . . . provide the proverbial 'smoking gun.'"). In Defendants' recent response to Plaintiff's First Request for Admissions, Defendants admitted they "did not institute a formal litigation hold" to preserve documents and data in this matter. [Dkt. 86-10 at 5-6.] "While a party's failure to issue a litigation hold does not inevitably constitute spoliation . . . it can be part of a mosaic of evidence to a finding of spoliation." *BankDirect Capital Fin.*, 2018 WL 1616725, at *3 (citing *Jones v. Bremen High*

*Sch.*, 2010 WL 2106640, at *9 (N.D. Ill. 2010).  The Court will address each category of electronic discovery Plaintiff raised in her spoliation claims against Defendants.

### a. Tyler Parr/Brittany Hunt

Tyler Parr, a former salesperson at Hubler Chevrolet, was directly involved in the sale of the Trax to Plaintiff, Brittany Hunt, as one of Plaintiff's primary points of contact throughout the transaction.  [Dkt. 86-14.]  Parr began text message communication, from his personal cell phone, with Plaintiff on approximately April 7, 2018, the day Parr received a sales lead for Brittany Hunt from the Defendant Bradley Management Group's Business Development Center ("BDC"), through at least the date of the incident on April 17, 2018, in which Plaintiff was told by Parr to return the car or it would be reported stolen. [Dkt. 86-14 at 5, 11-14.]  Plaintiff served Defendant Bradley Management Group[8] and Defendant Hubler with First Requests for Production on August 21, 2018 [Dkt. 41 at 1]; Request for Production No. 8 required Defendants to "[p]roduce **all text messages** between YOU and Brittany Hunt."  [Dkt. 42-1; Dkt. 42-2; Dkt. 42-3] (emphasis added).  Plaintiff explicitly defined "YOU" as "the person(s) to whom this Request is addressed, and all of that corporation's agents, representatives, **employees**, contractors, and attorneys."  [Dkt. 42-3 at 2] (emphasis added).  Parr undeniably falls under this category inclusive of "YOU."  Defendant Hubler's revised supplemental response to RFP No. 8, certified on November 16, 2018, referenced document production of bates numbers 000056-000060 and stated that "Tyler Parr no longer has access to all the text messages between him and Plaintiff."  [Dkt. 42-2 at 5.]

---

[8] The Court notes that it is Defendant Bradley Management Group's position that requests for production of text message communications, including those of Tyler Parr or other Hubler employees, are not applicable to Bradley Management Group, as it had no communication with Plaintiff.  [Dkt. 42-1 at 3.]

Plaintiff asserted that while Defendants did produce text messages between Tyler Parr and Brittany Hunt, the messages produced were "cherry-picked" and "only a limited, self-serving portion of the texts" were provided.  [Dkt. 86-1 at 21.]  Further, Hubler General Manager, Joseph Folck, testified in his January 17, 2019 deposition that Tyler Parr's text messages were "screen shotted from his phone" and that Defendant Hubler's Exhibit 40 contained less text messages than Plaintiff's Exhibit 40, consisting of Plaintiff's record of the complete conversation.  [Dkt. 86-4 at 13.]  When questioned about the "completeness" of the production of Tyler Parr's texts, Folck testified that he did not know why all of the text messages were not printed from Parr's cell phone.  [Dkt. 86-4 at 13.]  Plaintiff additionally points to Folck's Rule 30(b)(6) deposition conducted on March 22, 2019 where he continued to state nothing was done to verify the completeness of Tyler Parr's texts and there was no known reason for why the produced texts were not complete.  [Dkt. 86-1 at 21.]  In Tyler Parr's own March 19, 2019 deposition, Parr stated that no one ever asked Parr for "all" of his text messages with Brittany Hunt.  [Dkt. 86-14 at 3.]  In Defendants' response to Plaintiff's First Request for Admissions, Defendants admitted "[t]he cell phone that Tyler Parr used in April 2018 no longer exists," Defendants did not request all of Parr's text messages before his employment with Hubler ended, and Defendant Hubler "assumed that Tyler Parr had provided all of the texts between him and Plaintiff."  [Dkt. 86-10 at 4.]

Plaintiff's brief provides an example of the content of such deleted texts (as seen from Plaintiff's side of the text messages) in which Parr sent the following message to Hunt after Plaintiff inquired about Defendants' return policy: "Indiana law states that once [the vehicle is] off the lot, it's sold and reported to General Motors and the Bank . . . once you sign the paperwork in finance and drive off the lot the car is yours . . . That's Indiana State all [sic] for all

dealerships new/used/bhph." [Dkt. 86-1 at 21; Dkt. 86-14 at 11-12.]  Parr stated Anthony Leak,[9]

Parr's boss, told him to send the information/text to Plaintiff.  [Dkt. 86-14 at 11-12.]  At the

hearing on the motion, Defendants' counsel argued that Hubler had no idea that the text

messages provided to them by Parr were incomplete and that what was produced to them from

their former employee was preserved for litigation; rather, Hubler contends that Parr's personal

cell phone was not under Hubler's control.  *See* Fed. R. Civ. P. 34 (a)(1) ("A party may serve on

any other party a request within the scope of Rule 26(b) . . . to produce and permit the requesting

party to inspect, copy, test, or sample [any designated documents or electronically stored

information] in the responding party's possession, custody, or control[.]").  Defendants also

contend that, by Plaintiff's own admission, Plaintiff retains the thread of Tyler Parr's text

messages on her own cellular device, and thus argue that Plaintiff has not been prejudiced.  [Dkt.

92 at 10.]  Plaintiff argues that "it is irrelevant that Plaintiff had her side of the texts" and that in

the event Plaintiff's phone had been damaged, the missing texts would never have come to light.

[Dkt. 86-1 at 22.]

The Court is unpersuaded by Defendants' arguments pertaining to the preservation of

Tyler Parr's text messages with Brittany Hunt.  Based upon the Court's finding that Defendants'

duty to preserve evidence relevant to the lawsuit was triggered on April 19, 2018, Defendant

Hubler had no excuse for the failure to take necessary steps to ensure that the complete record of

text messages between Tyler Parr and Brittany Hunt were preserved.  Courts have addressed the

concept of text message preservation from personal and business-issued cellular telephones in an

effort to determine what level of "control" can be attributed to an employer.  *Compare In re*

---

[9] The Court notes further questions at Tyler Parr's deposition would reference "Tony Leak" testifying that Leak "disagreed with . . . these texts and never would have told [him] to say either of these things[.]" [Dkt. 86-14 at 11-12.]

*Pradaxa (Dabigatran Etexilate) Products Liab. Litig.*, No. 3:12-md-02385-DRH-SCW, 2013 WL 6486921, at \*16-18 (S.D. Ill. Dec. 9, 2013)[10] ("[D]efendants raised the issue that some employees use their personal cell phones while on business and utilize the texting feature of those phones for business purposes yet balk at the request of litigation lawyers to examine these personal phones.  The litigation hold and the requirement to produce relevant text messages, without question, applies to that space on employees cell phones dedicated to the business which is relevant to this litigation."), *with Cotton v. Costco Wholesale Corp.*, No. 12-2731-JWL, 2013 U.S. Dist. LEXIS 103369, at \*17-19 (D. Kan. July 24, 2013) (motion to compel text messages on employee personal phones denied where plaintiff did not contend defendant "issued the cell phones to these employees, that the employees used the cell phones for **any work-related purpose**, or that [defendant] has any legal right to obtain employee text messages on demand") (emphasis added).  Defendant Hubler was aware that its sales employees utilized personal cell phones as a generally acceptable practice to directly communicate with customers such as Plaintiff.  To some degree, it is arguable in this case that Defendant Hubler's management, General Manager Joseph Folck and Sales Manager Anthony Leak, communicated company directives to Tyler Parr to communicate to Plaintiff via text message using Parr's personal cell phone that she was unable to return the Trax upon Plaintiff's return policy inquiry just a few days after her April 9, 2018 transaction with the dealership and the instructions to bring the Trax back on April 17, 2018 before 5:00 pm or it would be reported as stolen.  [Dkt. 86-14 at 12-14; Dkt. 86-4.]

---

[10] This order was rescinded by *In re Petition of Boehringer Ingelheim Pharm. & Boehringer Ingelheim Int'l GMBH, in Pradaxa (Dabigatran Etexilate) Products Liab. Litig.*, 745 F.3d 216 (7th Cir. 2014), on other grounds, not on the basis of the text message analysis.  The Seventh Circuit held the district court exceeded its authority in changing the locations of depositions from an international location to the United States.  *Id.*

Furthermore, after the end of Tyler Parr's employment with Defendant Hubler, Parr did not retain his personal cell phone that was utilized for all of Parr's text communications with Brittany Hunt.  Discarding a cell phone containing relevant text message evidence is sanctionable.  *See, e.g., Christou v. Beatport LLC*, No. 10-cv-2912, 2013 WL 248058, at *13-14 (D.Colo. Jan 23, 2013) (permissive adverse inference instruction given after defendant allegedly lost cell phone without first preserving text messages); *Barrette Outdoor Living, Inc. v. Mich. Resin Reps.*, No. 11-13335, 2013 WL 3983230, at *3-4 (E.D. Mich. Aug. 1, 2013) (adverse inference instruction and $35,000 monetary sanction imposed after defendant discarded cell phone with text messages exchanged with other defendants).  Even in the ordinary course of purging and deleting materials from one's personal cell phone, the Court finds that the existence of *some* text messages within the Tyler Parr and Brittany Hunt communication thread, but not the *entire* message thread, is suspicious and leads to the inference that one would intend to "select" or "cherry pick" which messages to keep and which to discard.  The absence of some text message or electronic data is sanctionable.  *See, e.g., Se. Mech. Servs., Inc. v. Brody*, 657 F. Supp. 2d 1293, 1301-02 (M.D. Fla. 2009) (Sanctions warranted when defendant's wiping of his personal BlackBerry "may have deleted more than three weeks of relevant data.").

The Court finds Defendant Hubler took no effort whatsoever to preserve Tyler Parr's full record of text messages; no preservation policy appears to be in place for employees using personal phones to engage in sales for Defendant Hubler, no formal litigation hold was issued in this matter, Defendant Hubler's own General Manager, Joseph Folck, has no recollection for why preservation did not occur, and Parr testified to never being asked for the entirety of his communications for the purposes of litigation.  The Court finds Defendant Hubler's arguments that the company did not control Parr's actions of routinely purging his personal phone and/or acquiring a new phone, and therefore satisfactorily produced what material was given to them by

14

their former employee in compliance with the rules of discovery are meritless. "[Defendant] cannot dodge its responsibilities by claiming that its employee was ignorant; [Defendant] is responsible for its employees' actions." *Freidig v. Target Corp.*, 329 F.R.D. 199 (W.D. Wis. 2018); *see also Decker v. Target Corp.*, No. 1:16-cv-00171-JNP-BCW, 2018 WL 4921534, at *4 (D. Utah Oct. 10, 2018) (defendant held liable for spoliation of employees untrained in preservation policies).

Defendant Hubler had the **duty and ability** to adequately preserve text message evidence from Tyler Parr's cell phone. "'[B]ad faith' means destruction for the purposes of hiding adverse information." *Mathis*, 136 F.3d at 1155. The movant bears the burden to make this showing. *Bracey v. Grondin,* 712 F.3d at 1019. Plaintiff has provided a sufficient example of the kind of adverse information that was deleted from Tyler Parr's texts which consisted of Parr instructing Brittany Hunt on an unsupported and undetermined "Indiana law" that did not allow Plaintiff any type of return policy.[11] Plaintiff has met this burden. The Court struggles to reconcile this communication with Defendant Hubler's ultimate decision to report the Trax as stolen.

Defendants argument of the lack of prejudice to Plaintiff does not sway the finding of the Court.[12] But for Plaintiff's diligent comparison of her version of the text message thread to the

---

[11] Defendants' *Response* brief indicated in Footnote [2] that this argument is based on "a false factual underpinning" and that this text message was produced to Plaintiff in their initial disclosures. [Dkt. 92 at 10.] Defendants provided no evidence of this production as supplementation to their brief. The Court is not persuaded by Defendants' undeveloped argument. *See, e.g., Crespo v. Colvin*, 824 F.3d 667, 673 (7th Cir. 2016) ("perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived").

[12] The Court reminds Defendants that the judiciary "may still impose sanctions even where there is no prejudice but the actions of the party exhibit such flagrant contempt for the court and its processes that to allow the offending party to continue to invoke the judicial mechanism for its own benefit would raise concerns about the integrity and credibility of the civil justice system that transcend the interests of the parties immediately before the court." *See Fuery v. City of Chi.*, No. 07 C 5428, 2016 WL 5719442, at *11 (N.D. Ill. Sept. 29, 2016) (internal quotation omitted).

messages produced by Defendant Hubler, the knowledge of the destruction of this evidence would not have seen the light of day. *See, e.g., Nittolo v. Brand*, 96 F.R.D. 672, 676-77 (S.D.N.Y. 1983) (Defendants "may not properly escape the consequences of [their] own wrongful conduct" because Plaintiff was "diligent and persistent enough to overcome the obstacles which [they] placed in [her] path."). This Order will further illustrate that these evidentiary materials are but one area of problematic destruction in this case. **As such, the Court concludes that Defendant Hubler spoiled the evidence of Tyler Parr's text messages with Brittany Hunt.**

### b. Officer Sheler[13]/Joe Folck

The Court specifically examines the tale-telling timeline of Indianapolis Metropolitan Police Department ("IMPD") Officer Andrew Sheler's emergence onto the scene in this litigation, in relation to Plaintiff's spoliation and perjury claims. Plaintiff served her First Request for Interrogatories and Requests for Production on Defendants on August 21, 2018. [Dkt. 41; Dkt. 42-3; Dkt. 42-5.] Defendants submitted their initial responses to Plaintiff's discovery requests on October 10, 2018.[14] [Dkt. 49 at 2.] Plaintiff contended "[Defendants] objected to every request and did not produce a single document," thus, there was absolutely no

---

[13] The Court acknowledges that Defendants' representation of Officer Sheler's involvement as a non-party has proven to be a key factor in this case. The Court will further address the parties' dispute regarding Sheler's precise "role" as it pertains to Sheler's interaction with Defendants and Plaintiff in Section III(B)(2) of this Order.

[14] The Court notes that a total of 50 days passed after Defendants received Plaintiff's discovery requests via email and U.S. Mail; timely responses to Plaintiff's requests were due September 26, 2018. [Dkt. 59 at 5.] Defendants failed to request any extension; yet, during a September 27, 2018 status conference, Defense counsel, Lyndsay Ignasiak, told the Magistrate Judge she had submitted an email to Plaintiff's counsel in an effort to request more time for discovery. When Magistrate Judge Dinsmore requested a copy of the email, Ms. Ignasiak admitted that no such email existed. [*See* Dkt. 59- at 5-6 & n.1.] This misrepresentation to the Court marks the **beginning** of a common theme addressed throughout this Order.

mention of Officer Sheler.  [Dkt. 41 at 1.]  On October 23, 2018, Defendant submitted

supplemental responses to Plaintiff; yet again, Defendants failed to make any reference to

Officer Sheler.  [Dkt. 49-9; Dkt. 49-10; Dkt. 49-11; Dkt. 49-12.]  Defendant Hubler first

mentions Sheler in its November 16, 2018 revised supplemental responses to Plaintiff's First Set

of Interrogatories as follows:

> Interrogatory No. 2: Identify all communications You have had with the police
> regarding cars stolen from You for the time period 2016-present . . . .
>
> #1: This would include the instant case where Defendants['] representatives spoke
> with Officer Noel Gudat and **Officer Andrew Sheler** [sic] of the IMPD.
>
> Interrogatory No. 9: Identify all facts, witnesses, documents, communications, and
> any other evidence that support that the Trax was stolen by Brittany Hunt . . . .
>
> Other relevant witnesses would be Officer Noel Gudat and **Officer Andrew
> Sheler** [sic] of the IMPD.
>
> Interrogatory No. 11: Identify all communications between You and the police,
> including the Indianapolis Metropolitan Police Department, regarding Brittany
> Hunt . . . .
>
> Defendant spoke with IMPD Officer Gudat and **Officer Andrew Sheler** [sic] of
> the IMPD and explained the situation . . . at which time Officer Gudat told
> Defendant to report the vehicle as stolen.

[Dkt. 42-4] (emphasis added).  The Court notes that at no point within these responses does

Defendant Hubler identify **who** at Defendant Hubler communicated with Officer Sheler, nor is

the **mode** of the communication identified.  The plot continued to thicken regarding the "role" of

Officer Sheler when Defendants filed their *Answer* to Plaintiff's *Second Amended Complaint* on

December 21, 2018, and officially named Sheler[15] as a "non-party" potentially at fault for

Plaintiff's claimed injuries and damages.  [Dkt. 50 at 21.]  Defendant Hubler revised these

responses to Plaintiff's First Set of Interrogatories on March 11, 2019 to state that on April 17,

---

[15] The Court notes that Defendants did not explicitly list Officer Sheler in its initial July 6, 2018
*Answer* to Plaintiff's original *Complaint*.  [*See* Dkt. 13.]

2018, **before** the Trax was reported stolen, Hubler's General Manager, Joseph Folck, "summonsed IMPD Officer Andrew Sheler.  Officer Sheler called Plaintiff in an attempt to mediate the situation and have Plaintiff bring the Trax back to the dealership[.]"  [Dkt. 86-13 at 8.]  The Court notes that at no point does Defendant Hubler identify the *modality* of how Officer Sheler was "summonsed."

     At Joseph Folck's January 17, 2019 deposition, Folck testified he contacted Officer Sheler on Sheler's personal cell phone to request mediation assistance with Plaintiff, Plaintiff was hostile, and afterward Folck made the decision to report the car stolen.  [Dkt. 86-4 at 14-15.]  On the record, Plaintiff's counsel expressed surprise to learn this information regarding Sheler's interaction with Folck.[16]  At Folck's Rule 30(b)(6) deposition on March 22, 2019, which occurred **after** Defendant Hubler's revised responses to Plaintiff's interrogatories mentioning Folck's call to Sheler, Folck admitted he had and does exchange text messages with Sheler.  [Dkt. 86-7 at 14.]  Folck stated he did not keep his text messages "forever" and had "maybe" deleted some messages with Sheler.  [Dkt. 86-7 at 14.]  Folck's testimony confirmed that he only possessed text messages with Sheler dating back to October 10, 2018[17] and others prior to that time may have been deleted.  [Dkt. 86-7 at 14.]  Of the text messages still available on Folck's

---

[16] The Court notes that Joseph Folck's deposition occurred almost two months prior to the revised interrogatory responses from Defendant Hubler indicating that Folck summonsed Sheler for assistance with Plaintiff.  No prior discovery responses indicated these details that were gleaned from Folck's deposition testimony.  Plaintiff's counsel commented "[l]et's set aside Officer Sheler, because I have not heard of that before and I'm not familiar with that call . . . . It is not in the IMPD records.  It's not in anything that your counsel has produced or answered in discovery."  [Dkt. 86-4 at 19.]

[17] The Court acknowledges that October 10, 2018 is the same date Plaintiff received the belated initial discovery responses from Defendants; recall that these responses made no mention of Sheler in any capacity.

phone, some directly referenced discussion between Folck and Sheler surrounding the litigation.[18]

Plaintiff argued Defendant Hubler has "deleted the texts [between Folck and Sheler] at the same time that they were first asked to search for and produce documents; the texts were directly responsive to those requests."  [Dkt. 86-1 at 20.]  The Court agrees that the text messages were directly responsive to multiple discovery requests propounded by Plaintiff; for example, such material is responsive to the aforementioned Interrogatories Nos. 2, 9, and 11.  Additionally, that material is responsive to Plaintiff's First Request for Production No. 6, requesting all documents related to Brittany Hunt, and No. 12 seeking production of all documents related to reports or attempted reports of stolen vehicles to the police from 2016 to present.  [Dkt. 42-3 at 5, 7.]  As with Tyler Parr, Defendants contend texts prior to what Folck has provided are unavailable and all texts in question resided on a personal cell phone not owned by Hubler,[19] and there is no evidence that texts prior to October 10, 2018 existed much less were

---

[18] On January 17, 2019 Folck texts to Sheler: "Heading downtown to do three different depositions all in a row for that Britney [H]unt case.  Thought you might be excited for me!"  On March 4, 2019 (again prior to Defendant Hubler's revised interrogatories mentioning contact between Folck and Sheler), Sheler messages Folck about filling out paperwork to submit to the chief [of police] and expressing not knowing what Sheler may be asked regarding the case.  Folck responded with perhaps "the conversation had or what we [Hubler] said to you I guess. I hate it for all of us including you. Isn't right."  [Dkt. 93-1.]

[19] The Court will apply the same analysis regarding personal cell phones utilized for business purposes as it did with Tyler Parr's text messages.  Folck, as the General Manager, was utilizing his phone in a business capacity to communicate directly with IMPD regarding Hubler customers, operations, security, and community events Hubler sponsored.

The Court acknowledges, as indicated in the May 24, 2019 hearing, Plaintiff did not receive the text messages between Folck and Sheler until May 13, 2019, equating to a total of one week *after* Plaintiff filed her *Motion for Sanctions*.  Therefore, Plaintiff "adds to her earlier request for sanctions that judgment be entered against Defendant Hubler Chevrolet, Inc" for "commit[ing] a fraud on the Court with respect to witness Andrew Sheler."  [Dkt. 93 at 1.]  This contention will be addressed in the Court's latter discussion of Plaintiff's perjury claims.

related to Plaintiff's claims to support imposition of spoliation sanctions.  [Dkt. 92 at 9.]
Defendants proport that Plaintiff's arguments are "premature,"[20] and that Plaintiff could ask
Officer Sheler for his version of the text messages.  The Court finds Defendants' suggestion of a
non-party discovery request weak at best; a party should be able to rely upon the opposing
party's duty to provide discoverable information without extending discovery requests outward
to reach third parties not directly involved in the litigation.

Defendants knew through General Manager Joseph Folck that Officer Andrew Sheler
existed as a witness in this case.  Not only did Sheler exist, he was directly contacted by Folck to
intercede in the transaction with Plaintiff.  The Court finds it inexcusable that Defendants failed
not once, but twice, to disclose Sheler in its October 10 and October 23, 2018 responses to
Plaintiff's discovery requests.  Upon Sheler's disclosure in November 2018, more relevant
details as to his role in the incident were not provided by Defendants until Folck was deposed in
January 2019.  Beyond that, Plaintiff was not made aware of texts messages existing between
Folck and Sheler until March 2019, after Defendant Hubler had another chance to provide
disclosure in its March 2019 revised interrogatory responses.  Defendants had a duty to preserve
communications with Officer Sheler that was triggered on April 19, 2018.  The Court may infer
bad faith by a party's "pattern of contumacious conduct or dilatory tactics" when it considers
sanctions. *Crown Life Ins. Co. v. Craig*, 995 F.2d 1376, 1383 (7th Cir. 1993).  Defendants'
egregious pattern of failing to mention and adequately disclose details regarding Officer Sheler
warrant a finding of bad faith.

---

[20] The Court reiterates that it is not basing its recommendations for sanctions in this Order upon
the supplemental submission of Officer Sheler's affidavit.  [Dkt. 100.]  However, it is important
to state as further support for the Court's recommendations that Plaintiff's arguments are in no
sense premature as Sheler affirmed shortly after Plaintiff filed her motion that "[o]n or about May
21, 2019, [he] restored [his] cellular phone to factory settings[,]," switched carriers, and text
messages no longer exist and cannot be recovered.  [Dkt. 100-1.]

Defendants' argument that there is no direct evidence as to texts prior to October 10, 2018, much less their content related to Brittany Hunt, does not persuade the Court to decide in its favor.  "As Judge Easterbrook once pithily observed, "'[t]he evidence was circumstantial, but what circumstances!'" *BankDirect Capital Fin.*, 2018 WL 1616725 at \*11 (quoting *Branion v. Gramly* 855 F.2d 1256, 1258 (7th Cir. 1988)).  "The law makes no distinction between the weight or value to be given to either direct or circumstantial evidence."  1A K. O'Malley, J. Grenig & W. Lee, Federal Jury Practice and Instructions, Criminal 12.04 (5th ed. 2000); *see also* 4 L. Sand, J. Siffert, W. Loughlin, S. Reiss, & N. Batterman, Modern Federal Jury Instructions 74.01 (2002) (model instruction 74-2).  After examination of the number, frequency, and subject matter of texts between Sheler and Folck that were produced, the Court finds it not only plausible, but probable, that evidence existed that was relevant to this litigation.  [Dkt. 93-1.] Plaintiff has been deprived of "the precise nature and frequency of those [text] communications [between Folck and Sheler which] cannot be verified."  *See Ronnie Van Zant, Inc. v. Pyle*, 270 F. Supp. 3d 656, 670 (S.D.N.Y. 2017), *vacated in part*, 270 F. Supp. 3d 656 (S.D.N.Y. 2017) (case was not vacated in part on spoliation grounds; prejudice was found where pictures were preserved on new cell phone but text messages were lost).

Moreover, as district courts have previously observed, the timing of the destruction of evidence can support a finding of bad faith.  *See, e.g., Sokn v. Fieldcrest Cmty. Unit Sch. Dist. No. 8*, No. 10-cv-1122, 2014 WL 201534, at \*7 (C.D. Ill. Jan. 17, 2014) ("[A court may] infer bad intent based upon when the destruction occurred in relation to the destroyer's knowledge that the evidence was relevant to potential litigation.")  In this case, the absence of a litigation hold and the timing of the deletion of the Folck and Sheler texts could hardly be more damning: the Court finds it is not just mere happenstance that the only preserved text messages began on October 10, 2018, the identical date in which Defendants finally responded to Plaintiff's initial

discovery requests.  After such a slow reveal of Officer Sheler as a key witness with ties to direct communication with Defendant Hubler, and Defendants continued failure to satisfy their duty to preserve evidence, to now state that no text messages exist following Plaintiff's transaction with the dealership, is unfathomable to this Court.  **As such, the Court concludes that Defendant Hubler spoiled the evidence of Joseph Folck's text messages with Officer Sheler.**

### c. Tyler Parr Company Computer Wiped

Defendants' IT Manager and Rule 30(b)(6) witness on Defendants' ESI, Terry Dake, was deposed on January 15, 2019 regarding the status of Tyler Parr's company-issued computer. [Dkt. 86-9.]  Dake confirmed that "[a]ll sales desks have a Hubler-owned computer" and that each sales employee has a computer "dedicated to them."  [Dkt. 86-9 at 6-7.]  Dake testified that he did not participate in "any effort to assess the computer that Tyler Parr used" and that neither Dake nor anyone else at Hubler would know if Parr's computer was still in use at this time at the dealership.  [Dkt. 86-9 at 8-9.]  Rather, Dake stated he was in charge of replacing, "all of the new car sales computers" approximately four months prior to Dake's deposition and attested that all of the replaced computers were "wiped."  [Dkt. 86-9 at 8-9.]  By Defendant Hubler's own recent admissions "[a]ny electronic information that Tyler Parr stored locally on his desktop was deleted after May 16, 2018[,]" well after Defendants' duty to preserve evidence was invoked. [Dkt. 86-10 at 3.]

The Court finds no proffered evidence from Defendants that any steps were taken to preserve data from Tyler Parr's computer.  As Defendants have explicitly argued that they should not be held accountable for personal devices outside of their dominion and control, the Court finds it preposterous that Defendants have failed to preserve evidence from devices, such as Parr's computer, that were **directly** within company control.  It is not only plausible, but probable, that relevant evidence regarding the transaction with Brittany Hunt existed on a device

provided to Parr to conduct new car sales.  As such, the kinds of information stored on Parr's

company computer would be responsive to Plaintiff's discovery requests in this case.  "But if,

being sensitive to the possibility of a suit, a company then destroys the very files that would be

expected to contain the evidence most relevant to such a suit, the inference arises that it has

purged incriminating evidence."  *See Partington v. Broyhill Furniture Indus., Inc.*, 999 F.2d 269,

272 (7th Cir. 1993); *see also Se. Mech. Servs., Inc.,* 657 F. Supp. 2d at 1302 (adverse inference

allowed after Defendants "wiped" BlackBerry devices of electronic information).  **As such, the

Court concludes that Defendant Hubler spoiled the evidence of Tyler Parr's company-

issued computer.**

### d. Tyler Parr & Greg Newlin Email Accounts

Defendant Hubler's March 11, 2019 revised responses to Plaintiff's First Set of

Interrogatories expressly indicated that both Tyler Parr, primary salesperson, and Greg Newlin,

Hubler finance manager, interacted with Plaintiff during the course of her Trax purchase.  [Dkt.

86-13.]  Defendant Hubler's response to Interrogatory No. 9 listed Parr and Newlin as

"witnesses" that could "support that the Trax was stolen by Brittany Hunt."  [Dkt. 86-13 at 8-9.]

Defendant Hubler's recent admissions stated that Tyler Parr's email was "likely deleted on or

shortly after May 14, 2018" at the termination of his employment;[21] likewise Greg Newlin's

email account was "likely deleted on or shortly after June 12, 2018."[22]  [Dkt. 86-10 at 2-3.]

Defendant Hubler argued that Hubler employee email accounts are purged "in the ordinary

course" of business as Hubler has only a "limited number of GoDaddy email accounts."  [Dkt. 92

---

[21] The Court observed that Terry Dake, Hubler IT Manager, received notification that Tyler Parr's
employment ceased on May 14, 2018.  [Dkt. 86-10 at 2-3.]

[22] The Court additionally observed that Dake received notification on June 12, 2018 that Greg
Newlin's employment had ceased one day prior.  [Dkt. 86-10 at 2-3.]

at 11.]  Once an employment has ended at Hubler, Terry Dake is sent an email to delete the former employee's email account "to make room for the replacement or next employee."  [Dkt. 92 at 11.]  Hubler asserted there is no evidence anything of relevance was contained within these employee's emails to warrant spoliation.  [Dkt. 92 at 11.]  By Defendant Hubler's own admission, Terry Dake was not aware of this lawsuit upon the deletion of these emails.[23]  [Dkt. 92 at 11.]

By Defendant Hubler's own contentions, Tyler Parr and Greg Newlin were two pivotal witnesses that definitively interacted with Brittany Hunt.  As Plaintiff's counsel further argued in the hearing before the Court, email accounts were linked to Defendant Hubler's consumer retention and cloud-based software.  The Court has reviewed production of General Manager Joseph Folck's April 18, 2018 email[24] correspondence with Brittany Hunt to inquire about Plaintiff's new employment information.  [Dkt. 86-21.]  As a question of fact, "the trier of fact is entitled to draw any reasonable inference" in its determination of whether bad faith was present in the destruction of evidence."  *Davis v. Carmel Clay Sch.*, No 1:11-cv-00771-SEB-MJD, 2013 WL 5487340, at *6 (S.D. Ind. Sept. 30, 2013).  It is logical to infer that Defendant Hubler did communicate with Plaintiff via email, and moreover, that Tyler Parr and Greg Newlin's

---

[23] In a January 15, 2019 Rule 30(b)(6) deposition, Terry Dake testified he did not assist with the identification of ESI or documents related to this case by saying "No. Matter of fact, the first time I even heard about this was the other day, last week."  [Dkt. 92-6 at 2-3.]  Further, Dake stated there was no litigation hold regarding this matter (or any matter that he had ever received) and that he was not aware of any effort to preserve or recover emails.  [Dkt. 92-6 at 4-5.]

[24] The Court acknowledges that this referenced April 18, 2018 email between General Manager Joseph Folck and Brittany Hunt was not forwarded from Folck to Defense counsel until October 22, 2018.  [Dkt. 86-4 at 12.]  Plaintiff's brief contended this email was not produced to her counsel until seven months after disclosure was required.  [Dkt. 86-1 at 26.]  Folck testified he had done nothing to ensure all emails related to Brittany Hunt were searched for and produced; further, Folck stated he was not aware if anyone had conducted such an inquiry.  The Court again reiterates its finding of Defendants' established pattern of delayed production and continuous withholding of responsive materials to Plaintiff's discovery requests.

company-issued emails were comprised of the kind of relevant information sought from Plaintiff's discovery surrounding the sale of the Trax. The Court is unconvinced that a limited number of GoDaddy email accounts leading to the purging of Parr and Newlin's emails in the ordinary course is an alternative explanation so believable that it circumvents a finding of bad faith.[25] **As such, the Court concludes that Defendant Hubler spoiled the evidence of Tyler Parr and Greg Newlin's company emails.**

## 2. Destruction of Cloud-Based Software Information

Defendants utilized three identifiable platforms of cloud-based software during the transaction of the Trax purchase with Plaintiff; these consisted of RouteOne, GM Global Connect, and AutoBase. [*See* Dkt. 86-7.] RouteOne is a "loan processing tool" that communicates the "approvals or declines from the lenders" to whom Defendants submit customer applications; any information regarding conditional approval, such as Plaintiff's, would also be stored. [Dkt. 86-4 at 7; Dkt. 86-1 at 27.] General Manager Joseph Folck testified that general checklists for application submissions are found in RouteOne. [Dkt. 86-7 at 9.] Folck described GM Global Connect as "General Motors' dashboard," which among many functions

---

[25] The Court acknowledges Defendants' counsel Lyndsay Ignasiak's contention during the hearing before Magistrate Judge Dinsmore that Plaintiff has insufficiently relied upon *Malibu Media, LLC v. Tashiro*, a decision rendered by Magistrate Judge Dinsmore, to support Plaintiff's spoliation claims. No. 1:13-cv-00205-WTL-MJD, 2015 WL 2371597, at *17 (S.D. Ind. May 18, 2015). "[T]he Seventh Circuit has previously observed that a party may resist a finding of bad faith by establishing alternative explanations for destruction or loss." *Id.* Such alternative explanations must evidence plausible, legitimate reasoning. *Id.*

Hubler's IT Department is essentially run exclusively by Terry Dake; any communication to ensure adequate preservation of email data would only need to be relayed to one individual. [*See* Dkt. 86-9.] The Court finds it inexcusable that destruction of the emails of the two most prominent employee contacts connected to Brittany Hunt occurred; there was no litigation hold, the preservation would have only entailed maintaining a minimal **two** email accounts, the duty to preserve relevant evidence was triggered far earlier than the termination of either Parr or Newlin, and no request was submitted to Dake of the impending litigation. Thus, the Court expressly rejects Defendants' alternative explanation.

enrolls customers in OnStar, checks warranty statuses, re-calls, and any other communication that would occur between General Motors and a car dealership. [Dkt. 86-4 at 5.] When questioned in his deposition about what kind of GM Global Connect information could be applicable to Plaintiff, Folck stated he "would imagine [the information] that the vehicle may have been reported" might appear there. [Dkt. 86-4 at 6.] Finally, Defendant Hubler used a customer retention management ("CRM") application called AutoBase, which would include customer details such as contact information; this application has now been replaced by DealerSocket.[26] [Dkt. 86-7 at 5.] According to Folck, Hubler employees Folck and Sales Manager Anthony Leak, each testified that RouteOne typically retain entered information for a maximum period of sixty days. [Dkt. 86-4 at 3; Dkt. 86-12 at 5.] CRM data may be stored short-term to a period of years. [Dkt. 86-7 at 9.]

Further, Folck conceded that Brittany Hunt's data in relation to the April 2018 Trax purchase would have been available until approximately June 2018. [Dkt. 86-7 at 7.] However, other than "printing off [Hunt's] conditional approval," no one took steps to ensure RouteOne information was preserved; Folk was unable to ascertain the actual lenders, **aside** from GM Financial, to whom Plaintiff's application for funding was submitted. [Dkt. 86-7 at 8.] The Court finds no evidence produced to show Defendants made any effort to produce or preserve any communications within GM Global Connect; in fact, Folk maintained he did not know where the data would be stored and guessed at Detroit being the origination. [Dkt. 86-4 at 6.] Defendants also failed to preserve Plaintiff's data from AutoBase before the transition to

---

[26] General Manager Joseph Folck testified that the switch from CRM tool AutoBase to DealerSocket occurred in "[l]ate summer, early fall of 2018." [Dkt. 86-7 at 5.] The Court notes this shift took place **after** Brittany Hunt's transaction in April 2018 and **after** the duty to preserve attached.

DealerSocket; as a result, Hubler "admits that information from AutoBase was lost . . . ." [Dkt. 86-10 at 5-6.]

Defendant Hubler continued to maintain its popular defense to Plaintiff's spoliation claims here, claiming its cloud-based tools are not under its "possession, custody, and control." [Dkt. 86-10 at 7-9.] Plaintiff contended in the hearing that Defendant's assertion they had "no control" over these cloud-based applications was "wildly false." The Court agrees. Notwithstanding the dictum in *Chaveriat v. William Pipe Line Co.*, 11 F.3d 1420, 1426-27 (7th Cir. 1993), suggesting that having to ask someone else for a document means that the document is outside of a party's control, the Seventh Circuit has embraced the prevailing definition of "control" as "a legal right to obtain." *Thermal Design, Inc. v. Am. Soc'y of Heating, Refrigerating & Air-Conditioning Eng'rs, Inc.*, 775 F.3d 832, 838-39 (7th Cir. 2014) (quoting *Dexia Credit Local v. Rogan*, 231 F.R.D. 538, 542 (N.D. Ill. 2004)). This standard is certainly broad enough to encompass a contractual right to obtain documents. *See, e.g., Symons Int'l Grp., Inc. v. Cont'l Cas. Co.*, No. 1:01-cv-00799-RLY-MJD, 2015 WL 4392933, at *9 (S.D. Ind. July 15, 2015) (requiring plaintiff to acquire financial documents from financial institutions pursuant to account agreements). For example, the Court notes Joseph Folck's references to "contractual agreements" being held with Joe Munson, Defendants' CFO, as it pertains to RouteOne and Hubler's use of GM Global Connect being part of GM's franchise agreement. [Dkt. 86-7 at 7; Dkt. 86-4 at 6.]

The party seeking discovery bears the burden of showing that the nonmovant has control over the documents sought, and the Court may consider "any reasonable evidence regardless of the rules of evidence" in determining whether the movant has met this burden. *McBryar v. Int'l Union of United Auto. Aerospace & Agr. Implement Workers of Am.*, 160 F.R.D. 691, 695 (S.D. Ind. 1993) (citing *Nat'l Utility Serv., Inc. v. Nw. Steel & Wire Co.*, 426 F.2d 222, 225 (7th Cir.

1970)).  After examination of the deposition records of Joseph Folck and Anthony Leak

regarding contractual references, the detailed use, and descriptions of operation of these

applications, the Court finds Plaintiff has met this burden.  Moreover, these cloud-based

platforms are "tool[s] employed specifically to aid [Hubler] in facilitating its employees' work

responsibilities.  The data at issue pertain exclusively to these activities."  *Williams v. Angie's

List, Inc.*, No. 1:16-cv-00878-WTL-MJD, 2017 WL 1318419, at *3 (S.D. Ind. Apr. 10, 2017)[27]

(defendants did have control over sales platform as an end user and could not "avoid producing

these data with the excuse that [defendant] has outsourced critical components of their

employees' work tasks, all while taking full advantage of the benefits of that outsourcing

relationship").

      Plaintiff's brief in support of her motion contained an April 11, 2019 affidavit of GM

Financial in which the lender attested the following:

> 1) Plaintiff was "conditionally approved" for the Chevrolet Equinox; 2) GM
> Financial was contacted by the dealership to switch Plaintiff to the Trax and is not
> aware of any basis for that change; 3) GM Financial was aware of the short-term
> duration of Plaintiff's then employment and still conditionally approved the
> transaction; 4) GM Financial communicated with the dealership that proof of
> income would be needed within "45 days of the contract date"; 5) GM Financial
> validated the conditional approval until May 7, 2018; 6) on April 17, 2018 GM
> Financial assured Plaintiff the car should not be reported as stolen and does not
> know the basis for the stolen car report; 7) GM Financial did not cancel Plaintiff's
> contract after Plaintiff reported the loss of her job; and 8) GM Financial records
> indicate the dealership requested the return of the contract.

[Dkt. 86-2 at 2-6.]  It is important to note Plaintiff received information from GM Financial

through Plaintiff's own diligence in serving a third-party subpoena.  [Dkt. 86-2 at 2.]  Plaintiff's

*Reply* brief cited to examples of Joseph Folck's deposition in which other customer sales records

---

[27] This Court has posed the question: "Could companies be heard to have stored other critical
employment records with third parties and then resist production on the grounds that the third party
holds that data?"  *Williams*, 2017 WL 1318419, at *3.

were examined to question the General Manager about the kinds of electronic information that could be found about contract package returns; these examples stated comments such as "see dealer track or RouteOne for return details." [Dkt. 93 at 11.]  When questioned directly about whether any dealer track details concerning Plaintiff's contract existed, Folck responded that "It would have gone away with the record in RouteOne." [Dkt. 93 at 11.]  In addition, Plaintiff contended efforts to communicate with Brittany Hunt would have been noted; for example, at what time, what phone number, or what email address.  [Dkt. 86-1 at 27-29.]  Plaintiff argued "had the electronic data not been deleted, it would have been contrary to Defendants' claims." [Dkt. 86-1 at 29.]  Based upon the information gleaned from GM Financial, the Court makes the reasonable inference that adverse information was purged after Defendant Hubler's duty to preserve ESI for this litigation was triggered; yet again, Defendant Hubler took no efforts to save evidence the Court deems was within its control.  **As material evidence was destroyed from the very instruments Defendant Hubler used to input, track, and carry out Plaintiff's sales transaction, the Court concludes that Defendant Hubler spoiled the electronic cloud-based evidence.**

The Court reminds the Defendants "[t]he doctrine of spoliation is one of the most enduring principles of the common law.  In essence, it provides that when a litigant has destroyed, fabricated, or suppressed evidence, the trier of fact may (but need not) draw an inference that the spoliator believes its case is weak or unfounded." *BankDirect Capital Fin.,* 2018 WL 1616725, at *1; *see also* 2 Wigmore, Evidence §278 at 133 (3d Ed. 1940) ("The inference thus does not necessarily apply to any specific fact in the cause, but operates, indefinitely though strongly, against the whole mass of alleged facts constituting his cause.").

## B. Plaintiff's Perjury Claims

At the hearing on Plaintiff's motion, Plaintiff's counsel presented a second category of

claims in their pursuit of sanctions against Defendants; Plaintiff's counsel classified Defendant's conduct in this case as "perjury stacked on spoilation."  For the foregoing reasons and in the following outlined areas, the Court agrees that in addition to numerous offenses of spoilation, Defendants have committed multiple instances of perjury throughout the litigation process that warrant imposition of sanctions.  "If perjury pays benefits when it escapes detection, but has no cost when detected, there will be far too much perjury and the accuracy of judicial decisions will be degraded."  *Rivera v. Drake*, 767 F.3d 685, 687 (7th Cir. 2014).

### 1. False Statements of Defendant Bradley Management Group

Much like Defendants' portrayal of the role of Officer Sheler, the function and relationship of Defendant Bradley Management to Defendant Hubler and its connection to customers is nothing short of muddled.  On October 8, 2018, Defendant Bradley Management Group verified its initial, overdue, responses to Plaintiff's First Set of Interrogatories and asserted an objection to all seventeen propounded interrogatories.  [Dkt. 86-8.]  From the outset, as illustrated by these initial responses, Bradley Management Group has stated "it is a body and detail shop, and occasionally performs clerical functions for the stores in exchange for a management fee" and claimed it "never had any dealings or interactions with Plaintiff at any time."  [Dkt. 86-8 at 2-3.]  Bradley Management Group unequivocally described itself as "not in the business of selling cars."  [Dkt. 86-8 at 6.]  In its October 23, 2018 supplemental responses to Plaintiff's same interrogatories, Defendant Bradley Management Group again makes the identical contentions [Dkt. 49-11]; for a third time the Defendant maintains its assertions in its revised supplemental responses verified on November 19, 2018.  [Dkt. 49-13.]  Even Defendant Hubler's November 16, 2018 revised responses to Plaintiff's First Request for Production downplayed its co-Defendant's function, claiming "Bradley Management Group handles the

actual mailing of the [customer's contract]" to GM Financial.  [Dkt. 42-2 at 2.]  As discovery

progressed, Plaintiff began to call into question these representations.[28]

Multiple depositions conducted in 2019, prior to the filing of Plaintiff's motion, revealed

far greater insight into the actual operations of Bradley Management Group.  General Manager

Joseph Folck testified that Bradley Management Group is "not a repair shop" and that it

"process[es] the loan documents on behalf of the dealership and send[s] those out."  [Dkt. 86-4 at

4.]  Folck also stated the Business Development Center ("BDC") within Bradley Management

Group returned customer online sales inquiries and "could have" communicated with Plaintiff.

[Dkt. 86-4 at 5.]  IT Manager Terry Dake described Bradley Management Group as a

**"corporate office . . . . And if you think of a wagon wheel, so they're the hub and then all**

**the spokes out to the stores."**  [Dkt. 86-9 at 4] (emphasis added).  Two Hubler sales managers,

Robert Mohr and Anthony Leak, additionally corroborate these Bradley functions in their

depositions, particularly how the BDC assisted the sales floor with leads to customer inquiries.[29]

---

[28] The Court notes Plaintiff's counsel specifically expressed concerns to Defendants' counsel on November 21, 2018 in an email to Attorney Alex M. Beeman citing the problems with Defendants' revised supplemental discovery responses.  [Dkt. 49-4.]  Plaintiff's counsel wrote: "[R]epresentations have been made that [Bradley Management Group is] just the on-site repair shop, but from the insurance policy, state filings, and the name, they look more akin to a parent company than a repair shop."  [Dkt. 49-4.]  Alex Beeman's response stated Bradley Management Group is "essentially the clerical/accounting wing for all the different dealerships under the Hubler name," and its functions include "writing checks and accounts receivable" and "forward[ing] any deal package to the finance company."  [Dkt. 49-5.]  Mr. Beeman did not believe Bradley Management was a proper party to this lawsuit.  [Dkt. 49-5.]

[29] Robert Mohr testified the BDC "call[s] and set[s] appointments and tr[ies] to get customers in for us . . . . Pretty much its all sales . . . . Not service too much."  [Dkt. 86-11 at 3.]  Anthony Leak testified the BDC "is a group of people that take phone calls and take e-mails from customers . . . . Their job is to answer some of the preliminary questions customers might have and . . . when is a good time to turn that customer then over to the sales department[.]"  [Dkt. 86-12 at 4.]  The Court notes that while the BDC is no longer part of Bradley Management Group, it was at the time of Brittany Hunt's transaction.

31

In fact, Tyler Parr received the sales lead for Brittany Hunt from the BDC on April 7, 2018.
[Dkt. 86-14 at 5.]

In addition to deposition testimony, physical evidence has manifested in this case to illustrate the actual role of Bradley Management Group.  On April 11, 2018, Bradley Management Group, through its employee, Nora Mahorney, sent an email to General Manager Joseph Folck listing a missing item from Plaintiff's loan application; the item was a military verification status form.  [Dkt. 86-15.]  On April 18, 2018, **after** the Trax was repossessed, Nora Mahorney sent a second email to Folck which contained a copy of Plaintiff's driver's license. [Dkt. 86-17.]  In Defendant Bradley Management Group's belated document production, consisting of only a sole document throughout this litigation, the BDC's role finally becomes quite clear to the Court with the examination of the Employee Relations: Lead Loyalty sheet.[30] [Dkt. 94-2.]  Not only did the BDC have telephone contact with prospective clients, BDC employees are given scripts to answer questions about financial qualification, schedule dealership appointment times, and assist the BDC to "develop a rapport and relationship with the customer."[31]  [Dkt. 94-2 at 6.]

At the hearing, Plaintiff's counsel argued that there are over "50 employees who only do clerical things" at Bradley Management Group.  Yet, just four days before the hearing, on May 20, 2019, Defendant Bradley Management Group's second revised interrogatory responses stated Defendant has no dealings with Plaintiff, does not sell cars, and does not deal with any Hubler customers.  [Dkt. 94-1.]  For the first time, more details are provided regarding how Bradley

---

[30] The Court notes this document was not produced until after the initial, supplemental, and revised discovery responses submitted by Bradley Management Group and the Court's March 4, 2019 Order granting Plaintiff's *Motion to Compel*.  [Dkt. 59.]

[31] The Court notes the BDC script states: "**IMPORTANT:** Ask questions that develop a rapport and relationship with the customer!!"  [Dkt. 94-2 at 6] (emphasis in original).

Management Group handled Plaintiff's "contract package."[32]  Plaintiff's counsel argued had they

not pursued the issue of Bradley Management Group's role in this case, this information would

not have come to light.  The Court emphatically agrees.

       Only now, in recent admissions, does Defendant Bradley Management Group admit: 1)

Bradley is not a body shop; 2) Bradley is not a detail shop; and 3) Bradley employees do

communicate with customers.  [Dkt. 86-10 at 7.]  As such, the Court finds Bradley's prior

interrogatory answers to be false testimony.  Defendants argue such information is not relevant

to this matter and is not material to constitute perjury.  [*See* Dkt. 86-10.]  Misleading or

incomplete answers to interrogatories can meet the false testimony and materiality requirements

of perjury.  *See Dotson v. Bravo,* 202 F.R.D. 559, 567 (N.D. Ill. 2001); *Brady v. United States,*

877 F. Supp. 444, 452-53 (C.D. Ill. 1994) (dismissing case where party offered incomplete

interrogatory answers and repeatedly perjured himself).  Further, Bradley's false statements

directly established materiality as having a "natural tendency to influence" the decision-maker;

in this case the decision-maker was this Court.  *Dotson*, 202 F.R.D. at 567.  The Court's March

4, 2019 Order warned Defendants of the material nature of Bradley Management Group's role:

"As Defendants have placed Defendant Bradley Management Group's role 'at issue' contending

it is an 'improper party' in the litigation, it would follow that discovery of the requested

corporate documentation would shed further light on the determination of these assertions."

[Dkt. 59 at 10.]  Despite Plaintiff's contentions otherwise, this Court's Order did not require that

Defendant Bradley Management Group revise its interrogatory responses.  Rather, based upon

---

[32] The information disclosed for the first time by Bradley Management Group on May 20, 2019 is
as follows: "Defendant received the 'contract package' from Hubler, ensured that all necessary
documentation was in the package prior to sending it to GM Financial, and then sent the contract
package to GM Financial.  Bradley ensures that all information is in the dealer management
system."  [Dkt. 94-1 at 5.]  References are then finally made to Nora Mahorney's emails from
Bradley Management Group to various individuals at Hubler.  [Dkt. 94-1 at 5.]

the answers provided, the verification of Bradley's Vice President, Joe Munson, and the certification of Defendants' counsel as to these responses, the Court found Bradley Management Group "provided clear, complete, and unequivocal responses to Plaintiff's requests[.]" [Dkt. 59 at 20.]  The Court is now keenly aware that those responses were, in fact, false, and there were no attempts of correction by either the Defendants or counsel, despite multiple opportunities to do so.[33]

      Defendants' final argument that the missing information was a result of confusion and mistake and does not warrant perjury due to lack of willful intent is disingenuous and falls embarrassingly flat.  Plaintiff's *Reply* brief powerfully outlines the number of times Defendant Bradley claims to have made a mistake in the representation of its role in this matter; there are an unacceptable and astounding 31 times false statements have been submitted by Bradley to date. [Dkt. 93 at 7-8.]  "[N]o one needs to be warned not to lie to the judiciary."  *Ayoubi v. Dart*, 640 Fed. Appx. 524, 528-29 (7th Cir. 2016).  Defendants purport that "confusion is understandable given that the body shop is located in the same building as Bradley" and attached the following visual aid:

---

[33] In three responses consisting of Defendant Bradley Management Group's initial, supplemental, and revised responses to Plaintiff's First Set of Interrogatories, Vice President Joe Munson swore under oath "under the penalties of perjury" these responses were true and accurate.  The Court cannot fathom how the Vice President of an organization cannot know the basic roles and functions of his organization.  As recent as May 20, 2019, Munson continued to affirm these false statements in a final revised response.

The Court reminds Defendants' counsel of the duty to reasonably investigate whether responses to an opposing party's discovery requests are complete.  *Fautek v. Montgomery Ward & Co.*, 96 F.R.D. 141, 145 (N.D. Ill. 1982).  The Court finds no evidence Defendants' counsel conducted such an investigation.  *See, e.g., 3M Innovative Props. Co. v. Tomar Elecs.*, No. 05-756(MJD/AJB), 2006 WL 2670038, at *7 (D. Minn. Sept. 18, 2006) (sanctions imposed where party "presented no evidence . . . that it [had] conducted a reasonable investigation for responsive information or documents[.]")



[Dkt. 92 at 4.]  A simple reasonable investigation--which the Court finds no evidence that one

was conducted--could easily dispel such an unmeritorious and weak inference.  As Plaintiff

contended, "the issue is not what a casual passerby would believe" [Dkt. 93 at 6]; rather, it is

what Defendants absolutely knew or should have known to be untrue.  The sheer number of

times misrepresentations have been made to Plaintiff, Plaintiff's counsel, and to this Court

establish willful intent.  From the initial stages of this matter, Defendant Bradley Management

Group has asserted it is an improper party to obtain a "victory" of dismissal from this lawsuit;

determination of material elements such as who the identifiable appropriate parties are, is a

foundational building block of a lawsuit.  *See, e.g., Secrease v. W. & S. Life Ins. Co.*, 800 F.3d

397, 402 (7th Cir. 2015) ("falsifying evidence to secure a court victory undermines the most

basic foundations of our judicial system").  For the Court to infer sheer mistake in Defendants'

conduct is implausible.  **As such, the Court finds Defendant Bradley Management Group**

**perjured itself in its interrogatory responses.**

## 2. False Statements of Defendant Hubler Regarding Officer Sheler

The Court acknowledges Officer Andrew Sheler is an integral figure in this case, such

that, Sheler's status in relation to Defendants Bradley Management and Hubler have been repeatedly questioned. After the history of delay in Defendants' disclosure of Officer Sheler as a witness and non-party, Defendants continue to muddy the waters by characterizing Sheler as a "community resource officer"[34] and later an "independent contractor."[35] [Dkt. 86-1 at 18.] When Officer Sheler did show up at a second deposition attempt on April 9, 2019, which he terminated early due to becoming uncomfortable with questioning and requested counsel, Sheler acknowledged that Hubler "employs police officers for security" and had employed him but that he had not "worked for them for well over two years." [Dkt. 94-4 at 9-11.] Upon the review of Sheler's complete transcript from the April 9, 2019 deposition, the Court notes very little information was gleaned from Sheler regarding his work history, the time period in which he worked for Hubler, or his correspondence with General Manager Joseph Folck. [Dkt. 94-4.] However, Sheler stated he spoke with Folck often, with communication "almost always police related." [Dkt. 94-4 at 14.]

---

[34] In General Manager Joseph Folck's depositions which ultimately revealed that text message communication existed between Folck and Sheler, Folck stated Sheler was a "community affairs officer" of the Southeast District whom Folck called to help mediate the Brittany Hunt situation; further, Sheler is "just [one of the] officers that we have gotten to know" from the community. [Dkt. 86-4 at 15-16; Dkt. 86-7.]

On March 5, 2019, Officer Sheler failed to show up for his first deposition; Defendants' counsel, Alex Beeman, stated "Andrew Sheler is not an employee but is a contractor. Thus we are not authorized obviously to accept service on his behalf." [Dkt. 94-3 at 7.]

[35] The Court notes that, in an affidavit provided by Officer Sheler dated June 10, 2019, Officer Sheler describes himself as "a Hubler Chevrolet employee." [Dkt. 100-1 at 5.] The Court has authorized Defendants to complete the deposition of Officer Sheler by no later than July 24, 2019. [Dkt. 103 at 1.] Because Officer Sheler's affidavit was submitted after the hearing on this motion, the Magistrate Judge expressly declines to consider it in the context of this entry. This footnote is included because the District Judge's consideration of this report and recommendation is *de novo*, and such evidence will be fully developed by the time any objection to this entry will be considered. Obviously, if Officer Sheler is an employee of either of Defendants, then his inclusion as a non-party would be baseless and his May 21, 2019 destruction of electronic evidence on his cell phone would be even further evidence of Defendants' spoliation in this matter.

However, the evidence submitted in Plaintiff's *Reply* brief raise concerns of this Court.[36] Officer Sheler's application for employment was submitted to **Defendant Bradley Management Group** (not Defendant Hubler), leading the Court to refer back to the functions and operations of Bradley Management Group that have already been a large source of misrepresentation to this Court. [Dkt. 93-2.] Review of the text messages between Folck and Sheler raise serious questions about the work relationship between the two. For example, Folck has texted Sheler seeking assistance regarding "black male mid 30's he's calm now but escalates" presumably at the dealership in October 2018; Folck requested the printing of a police report for "Shelley" on November 6, 2018; Folck inquired about his key being missing on December 7, 2018, to which Sheler responded he would ask someone who was working the night before; Folck requested assistance from Sheler with missing wheels and tires on a suburban on their south lot on January 5, 2019; communication occurred between the two regarding the Brittany Hunt matter on January 17, 2019; on February 2, 2019, Folck requested assistance with seeing if someone has a warrant; and on March 4, 2019, a day before Sheler's first scheduled deposition, Sheler and Folck discussed what Sheler may be asked regarding what appears to the Court as the Brittany Hunt matter. Sheler makes the comment he would not be a "happy camper if it starts to effect my paycheck[.]" [Dkt. 93-1.] To the Court, these communications add to the Court's previous discussion regarding Sheler/Folck's texts in the context of spoliation, and create even more red flags and suspicion as to the representations made by Defendants. Hubler's own employee,

---

[36] The Court notes these materials were submitted in Plaintiff's *Reply* brief because Defendants did not make Sheler's and Folck's texts available until May 13, 2019; well after Plaintiff filed this motion.

Robert Mohr, testified that calls to police regarding the return of cars "happen from time to time"[37] and Sheler could provide more information about that.  [Dkt. 86-11 at 4.]

Defendant's counsel argued there is potentially confusion between the parties and deposed witnesses "over the semantics of what a community resource officer is" and as such it is not material to the case to warrant a finding of perjury.  Defendants have directly put Officer Sheler's role in this litigation "at issue" with late disclosure in discovery responses and by naming him as a non-party in this case.  As the Court has previously discussed, misleading or incomplete interrogatory answers can meet the first two elements of perjury.  Defendants knew about Officer Sheler's involvement in this matter from before the filing of this lawsuit; the Court finds no plausible explanation for why Officer Sheler's involvement was not disclosed adequately and accurately to Plaintiff and discovery related to his involvement was not produced and forthcoming in Defendants' discovery responses.  Further, the Court finds the Defendants' recurrent argument of "mistake" or "confusion" as to Officer Sheler's position lacking credibility; rather, the most reasonable inference is that Defendants made these omissions and misrepresentations with willful intent.  **As such, the Court finds Defendants Bradley Management Group and Hubler have engaged in providing false statements and perjured their interrogatory responses as they relate to Officer Andrew Sheler.**

---

[37] The Court notes that Plaintiff's brief contains an argument that Defendants have made misrepresentations in their discovery responses that they are "unaware of any other circumstances where they told the person that they would call the police."  [Dkt. 86-13 at 2.]  The Court acknowledges the deposition excerpts where sales managers, Robert Mohr and Greg Newlin, affirm this has happened before.  In connection with Mohr's testimony that Officer Sheler could provide more information, the Court is not saying that no additional information regarding stolen car reports or the threat of making a stolen car report does not exist.  Rather, the Court does not find the Defendants' response in this regard to be an entirely inconsistent answer from the deposition testimony from Hubler employees to constitute perjury, without specific examples. Accordingly, the Court will not base its recommended sanctions on this argument.

**3. False Statements of Defendant Hubler Regarding Preservation of Cloud-Based Software Information**

While the Court acknowledges Plaintiff's argument that Defendant Hubler made false statements regarding its ability to preserve cloud-based software, and the Court does not find Defendants' representation that their only ability to preserve such evidence was by creating screen shots within each program even remotely credible, the Court finds that its previous discussion regarding spoliation of this evidence is sufficient to address Defendant Hubler's conduct regarding this issue. Therefore, it will not engage in a separate perjury analysis, as the Court finds sanctions are already warranted for Plaintiff's spoliation claim.

**4. Other False Statements in Defendant Hubler's Interrogatory Responses[38]**

The Court will also briefly address other identifiable false statements made in Defendant Hubler's interrogatory responses. Defendant Hubler's March 2019 revised supplemental responses to Plaintiff's interrogatories stated that Brittany Hunt had a scheduled appointment, set up through the BDC, for April 7, 2018, which she failed to attend. [Dkt. 86-13 at 4.] On April 9, 2018, Defendant Hubler stated Hunt arrived at the dealership between 4:00 and 4:30 pm. [Dkt. 86-13 at 4.] Hubler's responses stated that Greg Newlin called Plaintiff one time, after April 9, 2018, to inform her to provide pay check stubs, and that Parr also followed up on this between April 10 and 12th. [Dkt. 86-13.] Hubler also responded that Officer Sheler was contacted on April 17, 2018 to speak with Plaintiff on the phone in an effort to get her to return the Trax. [Dkt. 86-13.]

---

[38] While these false statements were not explicitly discussed by Plaintiff's counsel in the hearing on the motion, the Court will briefly acknowledge them from Plaintiff's briefing on these issues.

The Court notes this entire timeline of events was refuted in deposition testimony[39] as follows: 1) Tyler Parr testified to the fact there was no April 7, 2018 appointment for Plaintiff; 2) Tyler Parr testified that Plaintiff arrived at the dealership on April 9, 2018 between noon and 1:00 pm; 3) Greg Newlin testified he had no further communication with Plaintiff after April 9, 2018; 4) Tyler Parr testified that he did not talk to Plaintiff requesting pay check stubs, rather that he had tried to contact her employer one time and failed to leave a message or follow up; 5) Brittany Hunt testified she received a call from Officer Sheler **after** her arrest and the car's repossession, and this call was to pressure her to return the Trax car keys. [Dkt. 86-1 at 16-17.]

Defendants' argued they do not contest Plaintiff's assertions to aforementioned matters 1-4; rather these were incidents of understandable "mistake" and upon the Defendants' "best recollection," and do not rise to the level of perjury. [Dkt. 92 at 6-7.] In addition, Plaintiff asserted telephone logs "produced both by Plaintiff and Defendants show that if [Officer Sheler's] phone call [to Plaintiff] ever occurred, it was on April 19, 2018, two days after Defendants reported Plaintiff's car stolen." [Dkt. 86-1 at 17; Dkt. 86-3 at 8-10.]

The Court finds this historical timeline Defendants have created relevant to the heart of many of Plaintiff's claims and as result, when taken in the totality, they are not inconsequential to avoid perjury. Plaintiff did not fail to show up at the dealership or appear closer to the end of

---

[39] The Court explicitly notes that Defendants' counsel claimed to represented Tyler Parr and Greg Newlin at the drafting of these interrogatory responses. As it relates to Tyler Parr, the attorney-client relationship between Defendants' counsel and Parr was challenged in Plaintiff's *Motion to Compel Tyler Parr's Deposition Testimony*. [Dkt. 75.] Ultimately the Court found an attorney-client relationship to have existed but that the position taken by Plaintiff on this issue was substantially justified. [Dkt. 84.] As yet another example of the Court's concerns within this case, Defendants' counsel, Lyndsay Ignasiak, did not properly document the representation with Parr as required by Indiana Rule of Professional Conduct 1.8(f) and failed to tell her co-counsel, Mr. Beeman, that Parr was represented by them, contributing to significant confusion and representations by Mr. Beeman that he did not know if Mr Parr was represented. [*See* Dkt. 76-1]; *see also* Ind. R. Prof. Conduct 1.8(f) & Comment [12] (requiring written consent from nonparty client when legal fees are being paid by a party to the lawsuit).

the business day.  Plaintiff's actual arrival time in the early afternoon of April 9, 2018 supports

her claim that she waited a lengthy amount of time to receive service; in addition, the BDC did

not schedule her for a test drive that she failed to show up for, leading to her plausible claim she

was never able to receive a test drive of the car she wanted.  The lack of phone calls made to

Plaintiff to inquire about her employment verification, the limited one attempt to verify the

information with her employer, and the misrepresentation of the timing of Officer Sheler's

contact, attack the very credibility of the Defendants' motivation to report the Trax as stolen.

The Court finds these incidents of misrepresentations in Defendant Hubler's interrogatory

responses are directly false testimony that were material to the case-specific factual contentions

of this case.  The Court further finds that the most reasonable inference is that the

misrepresentations were made with willful intent to create an incomplete and misleading

description of the events surrounding Brittany Hunt's transaction at the dealership.  When

deciding upon the imposition of sanctions, "we weigh not only the straw that finally broke the

camel's back, but all the straws that the recalcitrant party piled on over the course of the

lawsuit." *e360 Insight, Inc. v. Spamhaus Project*, 658 F.3d 637, 643 (7th Cir. 2011).  **As such,

the Court finds Defendant Hubler perjured itself in its interrogatory responses related to

these issues.**

  The Court reminds Defendants that in the Seventh Circuit a "litigant's misconduct can

justify default judgment, and perjury is among the worst kinds of misconduct."  *Rivera*, 767 F.3d

at 686; *see also Secrease*, 800 F.3d at 401 ("[Default] can be appropriate when the [defendant]

has abused the judicial process by seeking relief based on information that the [defendant] knows

is false.").  The Court has spent ample time and energy[40] "unraveling the misconduct of [the

---

[40] The Court's workload dictates that every effort must be made to ensure the speedy and efficient
administration of justice. When a party's conduct so intentionally impedes this process, the Court's

Defendants] and counsel in this case" and expressly acknowledges that this level of mockery of

the litigation process "penalize[s] honest litigants with genuine disputes who await a ruling from

the Court in their cases." *Littler v. Martinez, et al.*, No. 2:16-cv-00472-JMS-DLP, 2019 WL

1043256, at *1, *11 (S.D. Ind. Mar. 5, 2019) (The Court "expressed grave concerns regarding

the truth of sworn statements submitted by defendants" and imposed serious sanctions for the

parties' and counsel's misconduct.).

### C. Plaintiff's Claims Defendants Withheld Material Evidence

### 1. Production of Settlement Agreements & Dead Deals

At the June 11, 2019 telephonic status conference with the parties, the Magistrate Judge

authorized Plaintiff to file a motion to compel responses to her Second Request for Production to

Defendants.  [Dkt. 103.]  On June 14, 2019, Plaintiff filed this now pending *Motion to Compel*

*the Production of Settlement Agreements and Backed Out Deals* [Dkt. 102].  This Report and

Recommendation does not rule on Plaintiff's pending motion.  As this example is cited as but

*one* among many avenues of Defendants' sanctionable conduct and would not change the

Magistrate Judge's recommendations in this Order, the Court finds more substantive discussion

regarding production of these materials is best suited for an analysis within the context of

Plaintiff's pending *Motion to Compel*.

### 2. Production of Bradley Management Group Corporate Documents

On March 4, 2019, the Court granted Plaintiff's *Motion to Compel Responses to*

*Plaintiff's First Interrogatories and Requests for Production*.  [Dkt. 59; Dkt. 41.]  Among the

material Plaintiff sought in these initial requests was corporate documentation from Defendant

---

ability to maintain this essential balance is **gravely challenged**.  In the 12-month period ending
December 31, 2018, the weighted filings per judgeship in the Southern District of Indiana stood at
991, first in the Seventh Circuit, and second in the nation. *See*
http://www.uscourts.gov/statistics/table/na/federal-court-management-statistics/2018/12/31-1.

Bradley Management Group.  As of the hearing on this motion, Plaintiff's counsel stated these documents still have not been produced.  The Court's March 4, 2019 Order expressly instructed Defendant Bradley Management Group to "provide a complete and unequivocal response of requested corporate documentation, **on or before March 11, 2019.**"  [Dkt. 59 at 11] (emphasis in original).  Under Federal Rule of Civil Procedure 37(b)(2)(A), Defendant Bradley Management Group may be sanctioned for its failure to "obey an order to provide or permit discovery[.]"  In addition to the previously discussed conduct exhibited by Bradley Management Group, **Bradley Management Group's failure to provide these corporate documents is yet another corroborating instance further supporting the Magistrate Judge's recommendation of sanctions.**

### 3. Production of Officer Sheler Documents

The Court acknowledges Plaintiff's argument that material evidence was withheld in the failure to timely disclose Officer Sheler and relevant documentation relating to his role in the incident with Plaintiff.  The Court finds all aforementioned information regarding Officer Sheler was responsive to Plaintiff's initial discovery requests.  Due to the Court's substantive analysis of this issue in relation to Plaintiff's spoliation and perjury claim, the Court need not engage in any further analysis to determine that sanctions are warranted.

### 4. Production of Complete Tyler Parr Text Messages

The Court acknowledges Plaintiff's argument that material evidence was withheld in the "cherry-picked" version of Tyler Parr's texts.  The Court has previously noted that the "complete" version of the text message thread was responsive to Plaintiff's initial discovery requests.  Due to the Court's substantive analysis of this issue in relation to Plaintiff's spoliation claim, the Court need not engage in any further analysis to determine that sanctions are warranted.

## IV. Sanctions[41]

The Court is gravely concerned with Defendants' multi-layered exhibition of improper litigation conduct in the forms of spoliation of evidence, perjury, and violations of the discovery rules and the Court's previous discovery Order. Separately, these categories of Defendants' actions form individual levels of egregious behavior. As a totality from the outset of this case, the Court's assessment of "the whole ball of wax . . . [reveals that] the small incremental blows to the integrity of the [case] add up to something that requires sanctioning. Death by a thousand cuts is no less severe than death by a single powerful blow." *Fuery*, 900 F.3d at 464. "A district court has inherent power to sanction a party who 'has willfully abused the judicial process or otherwise conducted litigation in bad faith.'" *Secrease*, 800 F.3d at 401 (quoting *Salmeron v. Enter. Recovery Sys., Inc.*, 579 F.3d 787, 793 (7th Cir. 2009)).

The Court is well aware that the recommendation of default judgment is "draconian" in nature and does not take its finding in this case lightly. *See Adolph Coors Co. v. Movement Against Racism & the Klan*, 777 F.2d 1538, 1543 (11th Cir. 1985) ("default judgment is the most awesome weapon in the Rule 37 arsenal.") Plaintiff has met the standard of clear and convincing evidence to support an assessment of sanctions, and the Court has weighed the following factors in its recommendation: "(1) prejudice to the [opposing party]; (2) prejudice to the judicial system; and (3) deterrence and punishment." *Dotson*, 202 F.R.D. at 575; *JFB Hart Coatings, Inc. v. AM Gen. LLC*, 764 F. Supp. 2d 974, 980-81 (N.D. Ill. 2011). While the Court is required

---

[41] The Court notes that Plaintiff's motion discussed in great detail the imposition of a number of sanctions including preclusion of Defendants from proffering various arguments and evidence along with a number of outlined adverse inferences. [*See* Dkt. 86-1.] Though, the Court has examined and weighed the number of preclusion and adverse inference requests, for the purposes of brevity, the Court will not recite these here; rather these are incorporated from Plaintiff's brief on the motion. During the hearing on the motion and within Plaintiff's *Reply* brief, Plaintiff **explicitly advocated** for default judgment against both Defendants due to information learned from discovery responses provided by Defendants to Plaintiff **after** the filing of this motion.

to and has considered less severe sanctions to remedy the damage caused by Defendants'
conduct, the Court finds that Defendants' improper conduct has so tainted the discovery process
in this matter that it would be impossible for Plaintiff to obtain a fair trial on the merits of her
case. **Consequently, an entry of default against Defendants is the only reasonably
appropriate sanction for Defendants' egregious conduct in this matter.**

### V. Conclusion

Based on the foregoing, the Magistrate Judge recommends the Court **GRANT** Plaintiff's
*Motion for Sanctions Against Defendants for Perjury and Spoliation of Evidence* [Dkt. 86]. The
Magistrate Judge further recommends **the Court enter a DEFAULT against both Defendants
Bradley Management Group and Hubler** as to the merits of Plaintiff's claims. Once default
has been entered, the Magistrate Judge recommends the Court set a hearing to establish
Plaintiff's damages.

Any objections to the Magistrate Judge's Report and Recommendation shall be filed with
the Clerk in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), and failure to
timely file objections **within fourteen days after service** shall constitute a waiver of subsequent
review absent a showing of good cause for such failure.

Dated: 26 JUN 2019

_____
Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

Distribution:

Service will be made electronically
on all ECF-registered counsel of record via
email generated by the court's ECF system.